Filed 11/22/13  In re Candace P. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re CANDACE P. et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROBERT P. and MISTY W.,<br><br>        Defendants and Appellants. | A137902 & A138041<br><br>(Contra Costa County<br>Super. Ct. Nos. J11-01501, J11-01502) |

        In this consolidated appeal, Robert P. and Misty W. seek relief from the juvenile court order terminating their parental  rights with respect to their two minor children, Candace (now age two) and Katelyn (now age five).  Appellants argue that the juvenile court abused its discretion by denying their petitions for modification filed immediately prior to the permanency planning hearing.  They also contend that termination of their parental rights was improper under the "beneficial relationship" exception to adoption. We affirm.

# I.  BACKGROUND

Petitions in these juvenile dependency proceedings were filed under subdivision (b) of section 300 of the Welfare and Institutions Code[1] on November 1, 2011, alleging that Candace and Katelyn were at risk of harm due to Misty's mental health issues as well as the chronic substance abuse of both parents.  Misty had tested positive for marijuana at Candace's birth on October 22, 2011, and for cocaine at a prenatal visit on September 30. She reported a history of drug abuse involving methamphetamines, heroin, and cocaine as well as past, unsuccessful substance abuse treatment.  Although Misty was offered a placement in a residential drug treatment program where she could take both children, she refused it.

Moreover, in 1994, Misty had been involved in a dependency proceeding with her oldest daughter Brandi.  This prior action was instituted after the infant Brandi was seen at the hospital on issues of non-organic failure to thrive.  Even at that point, Misty was reported to have a history of substance abuse and domestic violence.  Reunification services were offered and were subsequently converted into family maintenance services as Misty and Brandi were both living with the maternal grandmother.  Dependency was dismissed in June 1995.  Then, in August 2007, Misty was involuntarily detained pursuant to section 5150 after she threatened to kill herself, Brandi, and Brandi's boyfriend.[2]  Misty admitted that she was chasing the boyfriend down the street with a knife when the police intervened.  Brandi was taken back into protective custody after disclosing that she was a long-term victim of physical and verbal abuse, that men were allowed to physically abuse her, and that Misty was a poly-substance abuser and an

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Pursuant to subdivision (a) of section 5150, "[w]hen any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Health Care Services as a facility for 72-hour treatment and evaluation."

alcoholic. Thereafter, Misty failed to comply with the services offered to her and, as a result, did not reunify with Brandi. At the time these dependency proceedings were filed, Brandi (then 17) was AWOL from her plan of long term foster care in Alameda County. Apparently, she had been living with her mother, but Misty had failed to report this to the proper authorities in Alameda.

With respect to Misty's mental health, the record discloses that she had been involuntarily detained pursuant to section 5150 "multiple times" for physical assaults on family members and for suicidal threats. Although she claimed not to have been formally diagnosed as bipolar, Misty admitted that she had "about ten or more 5150's," that she was subject to rapid mood swings, and that her mental illness significantly impacted her life and her addictive behaviors: "All my life I have struggled with substance abuse because I had to self-medicate to keep this thing [Bi-Polar] under control. I have a lot of anxiety issues. I don't like to leave the house. I have problems going out in public. I don't like being around people. I have all of these issues and I HAVE to smoke weed or drink just to be able to leave the house." Using this reasoning, Misty felt that she did not really have a drug problem: "I don't use drugs because I want to use them, but because I HAVE to because that is the way my mind functions." Misty stated that she began seeing a doctor for her mental health issues in mid-2010, but dropped off in her visits during her pregnancy with Candace. At the time these dependeny petitions were filed, Robert stated that he had known Misty for approximately four years and that she had been taking psychotropic medication for as long as he had known her. Misty reported being treated with Zoloft and Seroquel. Although Misty was told at the hospital not to nurse Candace while taking the Seroquel, she took it throughout her pregnancy and continued to do so while nursing.

With respect to drug use, Robert reported that he and Misty mostly smoked marijuana, as they did not have the money for hard drugs. However, Robert did confess to smoking methamphetamine while Katelyn was in his care a few weeks before Candace was born. And, at Candace's birth, the hospital social worker noted that Robert's behavior, physiology and affect were consistent with recent substance use. Moreover, in

April 2010, the couple's 27-day old daughter Tiffany died from undetermined causes. According to the coroner's report, the cause of death was either SIDs or "rollover suffocation." Robert admitted that he and Misty were smoking marijuana and drinking alcohol at the time of Tiffany's death. Finally, there were also indications of domestic violence in Robert and Misty's relationship, and both parents had a history of theft convictions. Robert had an additional history of substance-related crimes. The minors were detained in foster care on November 2, 2011, with supervised visitation ordered for Misty and Robert. Both parents submitted to the jurisdiction of the juvenile court on November 23, 2011.

Initially, the Bureau recommended that no reunification services be offered to Misty with respect to Katelyn and Candace, due to her failed reunification with Brandi based on similar issues. Ultimately, however, the Bureau changed its recommendation since Misty appeared to be engaging in services voluntarily. Thus, at the dispositional hearing in January 2012, the juvenile court ordered family reunification services for both parents. Specifically, Misty's reunification plan included parent education, residential drug treatment, random drug testing, individual counseling, and compliance with her course of psychiatric treatment. Robert was required to participate in an out-patient drug treatment program, attend individual counseling, submit to random drug testing, and complete a parenting class. Both parents were warned that—because Candace was a child under three—reunification services could be terminated after only six months if they failed to participate regularly and make substantive progress in court-ordered treatment. (See §§ 361.5, subd. (a)(1)(B), 366.21, subd. (e).) Moreover, because Katelyn was part of Candace's "sibling group," services in her case could also be limited to six months. (See §§ 361.5, subd. (a)(1)(C), 366.21, subd. (e).)

Unfortunately, neither parent's efforts at reunification went smoothly. Although Misty entered an approved residential drug treatment program on December 27, 2011, she was discharged on February 23, 2012, due to repeated angry outbursts involving "cursing and swearing and blaming others for what happened to her and her children." Misty did receive some individual counseling while in residential treatment, and she did

4

complete a parenting course. However, she refused to sign the necessary releases to allow the Bureau access to her mental health records, and thus the Bureau was completely unable to assess her mental health needs or the efficacy of her psychiatric care. Finally, Misty's drug testing yielded mixed results. Between January 19 and May 5, 2012, she had six negative tests, five no shows, and one positive test for amphetamines.

On May 14, 2012, Misty entered a newly-opened residential treatment program for women at the Bay Area Rescue Mission in Richmond. After her entry into this program, she tested negative for drugs up to the date of the six month review hearing in September 2012. The director of the program (who was also Misty's counselor) reported that she was participating in all aspects of the program and showing "enthusiasm and remarkable progress." However, the Bay Area Rescue Mission program had not been approved by the Bureau, and there were concerns that it was not evidence-based—that is, not a program comprised of components that have been determined through clinical testing to be effective for the treatment of substance abuse.

Robert, like Misty, had completed a parenting class. He also attended an outpatient drug treatment program from December 16, 2011, to March 28, 2012. Although he graduated from the program, Robert continued to drink alcohol during this time, stating that it was not a problem for him and did not interfere with his functioning. Moreover, although Robert was referred to several therapists and actually scheduled an initial visit with one of them, he never followed through or actually participated in any individual therapy. Between January 20 and April 9, 2012, Robert tested negative twice and failed to show for seven other drug tests. Then, on April 14, 2012, he was arrested and charged with robbery after an altercation involving the theft of a 50-pound bag of charcoal from a store. When Misty—who was present at the time—yelled at Robert for his behavior, he punched her twice in the face. He also resisted arrest. Robert admitted to being intoxicated at the time of the crime, and confessed to the arresting officers that he was addicted to methamphetamine and needed to get into a program. As a result of this incident, he was incarcerated through June 12, 2012.

Upon his release, Robert started a job with the Cal Trans Adopt-A-Highway Program. He was living in a shelter and his drug testing was generally negative (with two no shows). Robert's Probation Officer reported him to be compliant with the terms of his probation. Further, his Alcoholics Anonymous (AA) sponsor stated that Robert had been attending daily AA meetings and that Robert was working for him in his gardening business. Robert never submitted any AA attendance records to the Bureau, however. And, after discussing Robert's twelve-step participation with various parties, the social worker was "not convinced" that Robert was being "entirely forthcoming" about the level of his involvement.

While the parents were struggling with their reunification plans, Candace and Katelyn were moved from foster care to the home of their paternal aunt in December 2011. Sadly, both girls were facing challenges of their own. Candace was reported to become irritable in the evenings and difficult to calm. She did not like to be hugged. In addition, she was diagnosed with acid reflux and asthma and discovered to be suffering from a number of developmental delays. At eight months, Candace was unable to roll over or sit up independently. According to the Regional Center specialist, she did not have full use of her left hand, her left toes were often curled and her legs were both in a "frog" position. The paternal aunt felt that Candace might also have hearing issues in her left ear. However, by the time of the six month review—with weekly physical therapy and speech and nutritional services from the Regional Center—Candace was able to sit up unassisted.

Meanwhile, Katelyn was exhibiting significant behavioral challenges. She was reported to get angry and aggressive when she didn't get her way. In her previous foster placement, she would hit, kick, and bite other children and adults in the home if placed in a time out. If she didn't want to talk to someone, she would make animal noises, like meowing. In her aunt's home, she was having multiple daily tantrums and was screaming every night at bedtime for one to three hours. Katelyn was also engaging in a number of self-harming behaviors, including scratching her face, banging her body into walls, pulling her hair out, and poking herself with any sharp object she could find,

6

including screws she had unscrewed from her bed frame. She would also try to choke herself by swallowing objects. In addition, it was reported that Katelyn would intentionally hurt herself and then blame others for her injuries. Furthermore, Katelyn was aggressive towards others. For example, at one point she took a skewer from a kitchen drawer, approached the aunt's youngest son from behind, and motioned as if she was going to stab him in the back of the head. The aunt intervened and Katelyn ran from the room crying. In her previous foster placement, Katelyn had reportedly thrown rocks at other children.[3]

There were also concerns about Katelyn's apparent lack of bonding with her younger sister, Candace. According to the paternal aunt, Katelyn had made attempts to physically harm her sister. Katelyn's evaluating psychiatrist was concerned about her "truly dangerous behaviors such as sitting on her developmentally delayed infant sister's head." In addition, Katelyn told the social worker that she did not like Candace and wished that she were dead. The evaluating psychiatrist noted Katelyn's history of "homelessness, alleged physical abuse, possible sexual abuse and suspected exposure to domestic violence and adult substance use" and found her behaviors consistent with trauma resulting from these "alleged multiple and recurrent types of mistreatment." He did not recommend medication for Katelyn, but opined: " 'What Katelyn needs [more] than anything is permanent placement with consistent, capable parenting.' "

In July 2012, Katelyn was moved—at her aunt's request—from the home of her paternal aunt to a concurrent placement, that is a foster placement that is also a prospective adoptive home. The aunt stated that she could no longer care for Katelyn due to her own health concerns. Moreover, she reported that Katelyn's behavioral issues were too challenging and she was concerned for the other children in the home.

---

[3] Despite the severity of these behaviors, when Misty was asked to sign consent forms in February 2012 so that Katelyn could receive mental health services, she refused stating that Katelyn's issues were due to being separated from her parents and would be resolved once she was returned to their care. Misty also initially declined to sign consent forms so that Candace could be seen by the Regional Center, but she later did agree to give this consent.

Although the parents objected to having the siblings separated, the Bureau opined that, under the circumstances, both children would benefit from the arrangement. Indeed, Katelyn's psychiatrist believed that "having them together unquestionably carries a real risk of Katelyn physically harming her sister." Although an appropriate home could not be found in Contra Costa County, the Bureau was able to locate a family in another county capable of providing Katelyn with the care she needed, and the juvenile court approved this change in placement.

At the contested sixth month review hearing on September 10, 2012, both parents sought extended services, arguing that they had sufficiently complied with their reunification plans to warrant additional time. Misty also filed a petition pursuant to section 388 seeking placement of the children with her at her residential treatment facility under a plan of family maintenance. The juvenile court, however, rejected both of these options. Instead, it found by clear and convincing evidence that Misty had failed to participate in her court-ordered treatment, citing Misty's discharge from her approved residential program, her refusal to sign mental health consents so that the impact of her psychiatric condition could be evaluated, her mixed drug testing results, and her choice to enter a residential drug treatment program that had not been approved by the Bureau and appeared not to be evidence-based.[4] With respect to Robert, the court found a similar failure to engage in services based on his lack of individual therapy, his spotty drug testing, his relapse and arrest in April 2012, and his lack of understanding that alcohol is a drug. In addition, Robert had not re-engaged in outpatient treatment after his relapse and remained in a relationship with Misty. Moreover, the juvenile court found that there was "no credible evidence" that either Misty or Robert understood addiction issues. Finally, the court opined that Misty's refusal to sign mental health consents and releases for herself and Katelyn suggested that Misty was in denial regarding her mental health

---

[4] When evaluating Misty's new residential treatment program, the juvenile court found the testimony of the program's director unhelpful in determining whether the program was effective for the treatment of substance abuse. The court also found the director's blanket statement about Misty's "remarkable progress" of questionable weight given the director's failure to supply any factual basis for this opinion.

8

needs and the mental health needs of her child. For all of these reasons, the juvenile court terminated reunification services for both parents and set the matter for a permanency planning hearing pursuant to section 366.26 so that permanent out-of-home placements could be developed for both Katelyn and Candace.[5]

Immediately prior to the permanency planning hearing in January 2013, both parents filed petitions pursuant to section 388 seeking the reinstatement of reunification services due to changed circumstances since the September 2012 termination of reunification. Robert submitted evidence that he had completed his outpatient treatment program for a second time on December 13, 2012. He also supplied letters indicating that he had stable housing, was in compliance with his probation, continued to attend AA meetings, was testing negative for drugs and alcohol, and remained employed by Cal Trans and with his AA sponsor's gardening service. The Bureau, however, was concerned about the relatively short duration of Robert's sobriety given his chronic history of substance abuse and criminal activity, which had persisted even when he had been actively engaged in reunification efforts. Moreover, the Bureau noted that issues of domestic violence between the parents had not been addressed and cited the "critical lack" of any evidence that Robert had participated in therapy.

Misty's motion under section 388 was based largely on her continued participation in the residential treatment program at the Bay Area Rescue Mission. She was reported by the program to be "doing remarkably well in her personal recovery," and all of her drug tests at the program were negative. The Bureau, however, continued to have concerns that the Bay Area Rescue Mission treatment program was not approved, was not evidence-based and did not have "a track record of proven long term success with drug treatment." Although Misty was aware—at least as of the September 2012 hearing terminating reunification—that her current residential treatment program was not approved, she failed to seek treatment in a program endorsed by the Bureau. Given Misty's substantial mental health and substance abuse history, her history of failing to

_____

[5] On September 13, 2012, Misty filed Notices of Intent to File Writ Petitions challenging the juvenile court's decision to terminate services. However, no writs were ever filed.

9

complete treatment, her prior failed dependency with her oldest daughter, the April 2010 death of her 27-day old daughter Tiffany from undetermined causes, her setbacks while actually engaged in reunification, unresolved issues of domestic violence, and her failure to be forthcoming regarding her mental health issues, the Bureau opined that her additional four months of residential treatment did not constitute the type of changed circumstances sufficient to trigger a new reunification period pursuant to section 388.

In addition, with respect to both parents, the Bureau cited a number of incidents as evidence that both Misty and Robert were not taking responsibility for their own behavior and were unable to put their daughters' needs and emotions above their own. For instance, Robert was reported to have told Katelyn that she needed to be "good" in order to be returned to his care, and he became confrontational with Katelyn in a phone call in October 2012 during which Katelyn called the foster mother her "mother." After this conversation, Robert missed three weekly phone calls with Katelyn. Misty was also reported to have told Katelyn several times that if she kept being a "good girl" she could return to live with them. In addition, at a December 2012 visit—even though they had been told repeatedly that Candace was on a special diet and could not be fed—Robert gave her a carrot to eat. It was Katelyn who pointed out that he should not do this. And, at a visit in October 2012, the parents displayed clearly unhappy behaviors when told that Katelyn could not eat the food they brought because she had an upset stomach.

The Bureau also opined that providing additional reunification services in this case would not be in the best interest of either Katelyn or Candace. Since being placed with her current caretakers, Katelyn was making remarkable progress. In stark contrast to the many extremely serious behaviors that she had been exhibiting prior to her change in placement, Katelyn now had a happier disposition and had developed healthier methods for dealing with her anger, frustration, and needs. Amazingly, she had not had any aggressive issues with her peers. Rather, she was able to play appropriately with others and had successfully participated in play dates with friends. Moreover, Katelyn was attending pre-school two days per week, appeared to enjoy it, and had no major behavioral problems at school. Finally, she was making progress in the area of limit

setting and boundaries. The Bureau attributed these positive changes in Katelyn to the consistent care and nurturing that she was receiving in the fost-adopt home. Indeed, when Katelyn first arrived in her concurrent placement, she would not cry even if the situation merited it and—if she did something wrong—she would ask the prospective adoptive parents if they still liked her and if she would be able to stay. The fost-adopt parents continued to reassure Katelyn regarding their commitment to her, and Katelyn was developing good attachments both towards them and with their adult children. In fact, the social worker reported that Katelyn identified the foster family as her new family and saw the siblings as her brothers and sisters.

Although Candace continued to exhibit both fine and gross motor delays and faced physical challenges such as her gastro esophageal reflux and propensity for rashes, she too was making progress. Candace was able to crawl, pull herself up and take 4-5 steps. She was feeding herself with finger food and could hold her own bottle. She was also babbling and vocalizing to get attention and had demonstrated that she was able to bond with her caretaker. She continued to see an infant developmental specialist and a speech/dietician on a weekly basis. Candace also engaged in weekly occupational therapy.

In addition, the girls' relationship with each other had greatly improved. At several visits, Katelyn spontaneously kissed and hugged her sister. When Katelyn received some lip gloss, she stated that she was going to save it for Candace when she grew up. And, when Robert and Misty brought gifts for her, Katelyn asked if they had presents for Candace as well. The social worker surmised that Katelyn's increase in affection for her sister might be due to the fact that her own emotional needs were being met in a stable home. As a result of this change, Candace was able to have overnight visits with her sister which went extremely well, and Katelyn expressed a desire for Candace to live with her. Candace was placed in the same fost-adopt home as Katelyn on January 18, 2013, and the fost-adopt parents have indicated their desire to adopt both girls. Since this placement, Candace has been doing well, and the girls are reported to be enjoying their interaction with each other. At a home visit, the social worker observed

11

Katelyn to be very gentle, caring and affectionate with Candace. When Candace fell down, Katelyn tried to help her up. Further, she was careful to put all of her little toys out of Candace's reach. Katelyn has expressed her happiness that Candace is placed with her and will be there " 'forever and ever.' "

During the majority of these dependency proceedings, Misty and Robert have had supervised visits with Candace and Katelyn twice per month. Once reunification services were terminated in September 2012, supervised visitation decreased to once per month. The parents also typically participated in weekly phone calls with Katelyn. Phone contact with Candace was more sporadic. The Bureau recognized that both Misty and Robert love the minors. Visitation was consistent and generally positive, with the parents showing affection, being attentive to both girls, and bringing toys, gifts, and food. Although Katelyn stated that she liked to visit with her parents because it was "fun," she did not cry or whine when the visits ended. Further, her only major emotional melt-down since being placed in her fost-adopt home occurred immediately after a visit with Misty and Robert.[6] Katelyn has reported that she does not want to return to her parents' care because they were " 'mean' " to her, hitting her on the head and legs. Rather, she would like to live with her prospective adoptive parents who are "nice."

A contested permanency planning hearing was held on February 5, 2013, at which the juvenile court judge considered both the parents' 388 motions and the termination of parental rights. After testimony and argument, the juvenile court denied the parents' 388 motions, finding no changed circumstances sufficient to warrant modification of the prior

---

[6] On that day in November 2012, after visiting with her parents, Katelyn became disruptive at a social event, pushing, screaming and throwing herself on the floor. When her prospective adoptive mother decided to take her home, Katelyn kicked the car seat, pinched her caretaker, and took off her seatbelt. At home, she threw things in her room, pushed her fost-adopt parents, and indicated she was going to scratch her own face. The prospective adoptive mother held Katelyn tightly so she would not hurt herself. Katelyn responded by telling her that when she grew up she was going to kill her. Rather than be dissuaded by Katelyn's extreme behavior, the prospective adoptive parents developed a plan to ensure that Katelyn had more processing time and attention after visits with Misty and Robert.

order terminating reunification.  The judge further opined that the proposed modification would not only *not* be in the best interests of the minors, but would actually be detrimental to them.  Specifically, with respect to Robert, the juvenile court found that he had "a significant and troubling substance abuse problem which to this date he fails to comprehend or grasp."  In addition, the court was concerned that Robert had a "complete lack of insight" as to how his issues impacted his children, had failed to attend individual therapy, and had unresolved issues with domestic violence.  Similarly, with respect to Misty, the court found "nothing new."  Rather, Misty continued in a program that was not authorized by the Bureau and her refusal to sign a mental health release made it impossible for the Bureau to determine "whether or not she was receiving sufficient mental health treatment to address the issues that brought the family before the [c]ourt." After disposing of the 388 motions, the juvenile court went on to terminate the parental rights of Misty and Robert, finding Katelyn and Candace adoptable and refusing to apply the "beneficial relationship" exception to adoption.  Timely notices of appeal from both parents brought these matters before this Court.

## II. THE 388 PETITIONS

Both parents argue on appeal that the juvenile court erred by failing to grant their respective 388 motions made immediately prior to the permanency planning hearing. Pursuant to subdivision (a)(1) of section 388:  "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made . . . ."  (See also *In re Brandon C.* (1993) 19 Cal.App.4th 1168, 1172; Cal. Rules of Court, rule 5.570.)  To prevail on a motion under section 388, the petitioner must establish by a preponderance of the evidence (1) that a change of circumstance or new evidence exists, and (2) that the proposed modification would promote the best interests of the dependent child.  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

Even at the permanency planning stage, section 388 provides a means for the court to consider a legitimate change of circumstances that may justify a change to a prior order. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [section 388 provides an " 'escape mechanism' " built into process to allow a court to consider new information].) However, "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child is no longer paramount. Rather, at this point, 'the focus shifts to the needs of the child for permanency and stability.' " (*Stephanie M., supra,* 7 Cal.4th at p. 317, quoting *In re Marilyn H.*, *supra,* 5 Cal.4th at p. 309; see also *In re Angel B.* (2002) 97 Cal.App.4th 454, 464 (*Angel B.*).) In this context, "[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529 (*Kimberly F.*); see also § 388, subd. (d).) Although the specific factors that a court must consider under section 388 will vary with each case, relevant considerations include: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532; see also *Angel B., supra,* 97 Cal.App.4th at pp. 463-464.) Finally, the simple completion of classes is not, in and of itself, prima facie evidence that the requested modification would be in a minor's best interests. (*Angel B., supra,* 97 Cal.App.4th at pp. 462-463.)

On appeal, we will not disturb a juvenile court's determination under section 388 unless an abuse of discretion is clearly established. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1704.) When reviewing a juvenile court order for abuse of discretion, the " 'appropriate test . . . is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272; *Stephanie M., supra,* 7 Cal.4th at pp. 318-319,

quoting *Walker*.)  Accordingly, we will not reverse a juvenile court's denial of a 388 petition " 'unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations.]' " (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421-422 (*Geoffrey G.*); *Stephanie M., supra*, 7 Cal.4th at p. 318, quoting *Geoffrey G.*)  Given this high standard, it is a rare situation when the denial of a motion pursuant to section 388 will merit reversal.  (*Kimberly F., supra,* 56 Cal.App.4th at p. 522.)

Our review of these proceedings leads us to the inescapable conclusion that this is not one of those "rare situations" where reversal is warranted.  Both Misty and Robert have significant histories of entrenched substance abuse and Misty has also exhibited a life-long struggle with serious mental illness.[7]  While both parents were making some progress in their recovery, neither showed that they possessed the insight into addiction necessary to maintain long-term sobriety.  In addition, Robert had failed to engage in the individual therapy that might have helped him understand how his addiction impacted his life and his children, and he had unresolved issues of domestic violence.  Furthermore, because Misty refused to be forthcoming regarding her mental health issues, the Bureau

---

[7] In this regard, appellants' oft-repeated argument that this was not a particularly significant case because there were no overt signs of abuse or neglect at the time the petitions were filed is not well taken.  Misty's mental health issues and both parents' substance abuse were clearly negatively impacting this family.  Misty continued to use drugs while pregnant with Candace and she failed to stop taking her psychotropic medication while nursing Candace despite being advised to do so.  Further, Misty had failed to reunify with her oldest daughter due to mental health and substance abuse issues.  In addition, only 19 months prior to the filing of the instant proceedings, both parents suffered the tragic death of their infant daughter Tiffany from undetermined causes while under the influence of drugs and alcohol.  And, while Katelyn may have been dressed and fed, the effect of her exposure to her parents' unstable and drug-impacted lifestyle cannot be minimized.  Rather, Katelyn's evaluating psychiatrist found her extreme behavioral issues consistent with trauma resulting from her history of "alleged multiple and recurrent types of mistreatment" which included "homelessness, alleged physical abuse, possible sexual abuse and suspected exposure to domestic violence and adult substance use."

was simply unable to determine whether or not she was receiving sufficient mental health treatment.

With regard to the children, the record is clear that Katelyn was making remarkable progress since being placed with her prospective adoptive parents in a nurturing and consistent home, including developing good attachments with both the prospective adoptive parents and their adult children. In addition, with consistent treatment of her myriad special needs, Candace was also progressing positively. Moreover—given Katelyn's stability and progress—Candace was able to be placed in the same home as her sister with highly capable prospective adoptive parents that were committed to giving her a permanent home.

Under these circumstances, we agree with the juvenile court that providing additional reunification services to the parents in this case would not only *not* be in the best interests of the minors, but would actually be detrimental to them. There was no abuse of discretion.

### III. THE BENEFICIAL RELATIONSHIP EXCEPTION

Both parents also contend, however, that—rather than terminating their parental rights—the juvenile court should have applied the "beneficial relationship" exception to block the adoption of the minors. At a permanency planning hearing, the juvenile court is charged with determining the most appropriate permanent plan of out-of-home care for a dependent child that has been unable to reunify. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50 (*Casey D.*).) The permanency planning hearing is designed to protect a dependent child's "compelling" right "to have a placement that is stable, permanent, and allows the caretaker to make a full emotional commitment to the child." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1320 (*In re A.A.*).) As the most permanent of the available options, adoption is the plan preferred by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Thus, if a court finds that a child is likely to be adopted if parental rights are terminated, it *must* select adoption as the permanent plan unless it finds a "compelling reason for determining that termination would be detrimental to the child" due to one or more of the circumstances specified by statute. (§

16

366.26, subd. (c)(1)(B); see also *In re A.A., supra,* 167 Cal.App.4th at p. 1320.) " 'The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—"must be considered in view of the legislative preference for adoption when reunification efforts have failed." [Citation.] At this stage of the dependency proceedings, "it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home." [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption.' [Citation.]" (*In re A.A., supra*, 167 Cal.App.4th at p. 1320.)

A single statutory exception is implicated in the present case—where termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parents bear the burden of proof on both of these prongs: (1) that visitation was consistent and regular; and (2) that the child would benefit from continuing the relationship. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81.) In *Autumn H., supra,* 27 Cal.App.4th at page 575, the court articulated a test for determining whether a child would benefit from continuing a parental relationship. To succeed under this test, the parents must establish that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." In evaluating this issue, the court must balance "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*) The beneficial relationship exception must be examined on a case-by-case basis, taking into account the many variables which impact the parent/child bond. Factors to be considered include: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect

17

of interaction between parent and child, and (4) the child's particular needs. (*Id.* at pp. 575-576; see also *In re Angel B., supra,* 97 Cal.App.4th at p. 467.)

For purposes of the beneficial relationship exception, "pleasant and cordial . . . visits are, by themselves, insufficient to mandate a permanent plan other than adoption." (*In re Brian R.* (1991) 2 Cal.App.4th 904, 924.) Indeed, "frequent and loving contact" may also be insufficient to establish the type of beneficial relationship "contemplated by the statute." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418 (*Beatrice M.*).) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H, supra,* 27 Cal.App.4th at p. 575.) The basis of a beneficial relationship, however, is that the parents have "occupied a parental role." (*Beatrice M., supra,* 29 Cal.App.4th at p. 1419.) " 'While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.' " (*Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) Given this analytical framework, we cannot say that the juvenile court erred in this case by refusing to apply the beneficial relationship exception to block the adoptions of Katelyn and Candace. [8]

First, at the time of the permanency planning hearing in February 2013, Katelyn was only four and one-half years old and had lived away from her parents for 15 months. Candace (then 15 months old) had lived in out-of-home care for virtually her entire life. While we agree with appellants that day-to-day contact is not essential to successfully

---

[8] Case law is divided as to the correct standard of review of an order determining the applicability of a statutory exception to termination of parental rights. (See *Autumn H., supra,* 27 Cal.App.4th at p. 576) [applying the substantial evidence standard]; *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351 [applying the abuse of discretion standard]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [applying substantial evidence standard to whether the beneficial parent-child relationship exists; applying abuse of discretion standard to whether that relationship provides a compelling reason to apply the exception].) However, the "practical differences" among these standards of review are not significant (see *Jasmine D., supra,* 78 Cal.App.4th at p. 1351), and, on this record, our conclusion would be the same under any of these standards.

invoke the beneficial relationship exception, it is telling in this case that visits were never increased in number or duration and remained supervised throughout these proceedings. Under such circumstances—where the parents were not providing for their children's needs in any sustained way—the juvenile court could reasonably conclude that the parents were not occupying a parental role. Indeed, with respect to Candace, Misty, herself, admitted that they had only a "slight bond" and that it was "nothing that a full-time having custody of her bond would be." In short, there was no evidence here that terminating the minors' relationships with Robert and Misty would pose any real risk of emotional harm to either minor.

Further, while the parents did visit regularly with the children and the visits were generally described as appropriate and loving, there was also evidence that continuing contact with the parents was not wholly positive. With respect to Candace, the parents showed themselves unable to be attentive to her special dietary needs. Additionally, as the juvenile court recognized, by telling Katelyn "that if she were simply better then she would be able to come home" the parents were "inflicting more trauma on Katelyn and [giving] her more layers of issues that she [will] have to deal with as she moves forward in her life." The evidence also showed that Misty and Robert had difficulty putting the minors' needs before their own. Moreover, Katelyn's one major emotional melt-down in her current placement came after a visit with her parents.

Finally, and perhaps most importantly, the record reflects that both Candace and Katelyn are minors with a particular need for stability and consistency. Prior to her current placement, Katelyn's behaviors were so extreme that psychotropic medication was contemplated for the four-year old. Her evaluating psychiatrist, however, opined that, rather than medication, "[w]hat Katelyn needs [more] than anything is permanent placement with consistent, capable parenting." And, in fact, the record reflects that Katelyn made remarkable progress after being placed in a nurturing and consistent home. Candace also requires stability and consistency given her developmental delays and many physical issues. The prospective adoptive parents are committed to providing a permanent home for both girls. They have obtained all necessary services for the minors

19

and have proved themselves to be "very intuitive to each of the children's special needs." All of these factors tip the scales decisively in favor of adoption for these two young siblings. Since the evidence more than supports the juvenile court's refusal to invoke the beneficial relationship exception to adoption in these proceedings, we decline to disturb that decision on appeal.

## IV. DISPOSITION

The judgment is affirmed.

_____
REARDON, J.

We concur:

_____
RUVOLO, P.J.

_____
RIVERA, J.